**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Armand Andreozzi, | No.  CV 18-02400-PHX-DGC (BSB) |
| Plaintiff, | |
| v. | **ORDER** |
| Unknown Ricotta, et al., | |
| Defendants. | |

On July 30, 3018, Plaintiff Armand Andreozzi, who is confined in the United States Penitentiary (USP)-Marion in Marion, Illinois, filed a pro se civil rights Complaint (Doc. 1) and paid the filing fee.  On August 24, 2018, Plaintiff filed a Motion for Service (Doc. 3).  The Court will order Defendants Ricotta, Asberry, Smith 1, Briggs, Ackley, Tracy, Mitchell, and Connors to answer Count One of the Complaint, will order Defendants Ricotta, Asberry, Tracy, Mitchell, and Connors to answer Count Two, will dismiss the remaining claims and Defendants without prejudice, and will deny the Motion for Service as moot.[1]

## I.      Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff

---

[1] The Court will deny this Motion as moot because it will order service on Defendants Ricotta, Asberry, Smith 1, Briggs, Ackley, Tracy, Mitchell, and Connors.

has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

**II.    Complaint**

In his six-count Complaint, Plaintiff asserts that the Court has jurisdiction pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); 28 U.S.C. § 1331; and the Administrative Procedures Act (5 U.S.C. § 701 et seq)

("the APA"). Plaintiff has named several Defendants, who work or worked at various federal correctional facilities, and numerous fictitiously identified Defendants, Jane/John Does 1-54.

Plaintiff sues the following Defendants: Federal Correctional Institution (FCI)-Phoenix Health Services Clinical Director Doctor Ricotta; FCI-Phoenix Health Services Administrator Trainee Asberry; FCI-Phoenix Health Services Associate Warden Smith ("Smith 1"); FCI-Phoenix Health Services Nurse Practitioner Briggs; FCI-Phoenix Health Services Administrator Ackley; FCI-Phoenix Warden Kathryn Tracy ; Western Regional Director Mary Mitchell; National Inmate Appeals Administrator Ian Connors; USP-Lewisburg E Unit Case Manager Giordani; USP-Lewisburg E Unit Manager Childress; USP-Lewisburg Warden Williamson; USP-Victorville Warden Norwood; Federal Medical Center (FMC)-Devens GA-Unit Manager Hutton; FMC-Devens Warden Grondolsky; FCI-McKean BB Unit Counselor Smith ("Smith 2"); FCI-McKean BB Unit Manager Wilson; FCI-McKean Warden Bobby Meeks; FCI-Big Spring Sunrise Unit Case Manager Jones; FCI-Big Spring Warden Batts; FCI-Mendota Warden Raphael Zuniga; FCI-Phoenix Navajo Unit Counselor Powell; FCI-Phoenix Navajo Unit Case Manager Jefferson; FCI-Phoenix Navajo Unit Manager Dosanj; FCI-Phoenix Case Manager Coordinator Wastell; FCI-Phoenix Associate Warden Jones; USP-Marion L Unit Counselor Dooley; USP-Marion L Unit Case Manager Clark; USP-Marion N Unit Counselor Basler; USP-Marion N Unit Case Manager Murphy ("Murphy 1"); USP-Marion L and N Unit Manager Byrum; USP-Marion Case Manager Coordinator Daun; USP-Marion Associate Warden Powers; USP-Marion Warden True; North Central Regional Director Sara M. Revell; the United States of America; the Federal Bureau of Prisons; FMC-Devens Discipline Hearing Officer Anthony Amico; FCI-McKean Discipline Hearing Officer Schnieder; Northeast Regional Director Norwood; FCI-McKean Special Investigations Officer Michael Murphy ("Murphy 2"); and National Inmate Appeals Administrator Rodgers.

In **Count One**, Plaintiff asserts a medical care claim and alleges that he was diagnosed with bilateral Morton's neuroma,[2] which is documented. (Doc. 1 at 9.)[3] On November 15, 2015, Plaintiff was transferred to FCI-Phoenix and had a Chronic Care appointment with Defendant Ricotta on November 19, 2015. (*Id.*) Plaintiff informed Ricotta that prior to his transfer from FCI-McKean to FCI-Phoenix, a new pair of orthotics had been ordered on his behalf. (*Id.*) On November 29, 2015, Plaintiff emailed Ricotta to inquire about the orthotics. (*Id.*) Plaintiff received a response to the email, but it did not address the orthotics. (*Id.*) On December 22, 2015, Plaintiff sent another email to Ricotta requesting new orthotics, but he did not receive a response. (*Id.*) On January 11, 2016, Plaintiff spoke to Defendant Asberry, and Asberry told Plaintiff that orthotics had not been ordered and to report to sick call because the orthopedic surgeon's recommendations from FCI-McKean "would not be accepted at [FCI-] Phoenix." (*Id.*) Plaintiff was told that "an orthopedic referral was made," but he contends that "a referral was not made." (*Id.*) On February 16, 2016, Plaintiff filed a "BP-8." (*Id.*) On February 18, 2016, Plaintiff sent a third email requesting orthotics. Ricotta responded, but failed to address Plaintiff's request for orthotics. (*Id.*) On February 29, 2016, Plaintiff sent a fourth email outlining "the entire situation," but he did not receive a response. (*Id.*)

On March 1, 2016, Defendant Asberry offered Plaintiff "Spenco arch supports," but Plaintiff told Asberry the supports would not suffice because the same supports had not alleviated his condition in 2011. (*Id.* at 10.) Plaintiff also demonstrated why the arch supports "were not the proper medical device." (*Id.*) On March 2, 2016, Plaintiff showed Asberry his "Medical Duty Status sheet," which showed that Plaintiff had the arch supports in 2011. (*Id.*) Asberry threatened Plaintiff with "treatment refusal." (*Id.*)

---

[2] Morton's Neuroma is "an injury to the nerve between the toes that causes thickening and pain." *See* https://medlineplus.gov/ency/article/007286.htm (last visited Sept. 25, 2018).

[3] The citation refers to the document and page number generated by the Court's Electronic Case Filing system.

On March 4, 2016, Asberry asked Plaintiff to try the supports, so Plaintiff accepted the arch supports "on a trial basis." (*Id.*) Asberry did not tell Plaintiff that he would need to start at "square one" and return to sick call if the supports were again ineffective. (*Id.*)

On March 11, 2016, Plaintiff received a response from Asberry to his BP-8, which incorrectly stated that the supports could be trimmed to the appropriate length. (*Id.*) Even when the supports are trimmed down "all the way," they were still too long for Plaintiff, and the "plastic plate puts pressure on the exact point of the inflamed nerve." (*Id.*) Plaintiff claims that Asberry was aware of that issue on March 2, 2016. Asberry then encouraged Plaintiff to return to sick call "for further evaluation . . . ." (*Id.*)

On March 14, 2016, Plaintiff spoke to Defendant Smith 1 and asked Smith 1 if Asberry "put together the packet of medical issues Asberry was ordered to do in January 2016." (*Id.*) Smith 1 told Plaintiff that Asberry had not done so, and Plaintiff asserted the failure was a "violation of the Standards of Employee Conduct." (*Id.*) Smith 1 summoned Asberry to discuss the issues, and when Plaintiff asked Asberry about his directive to Plaintiff to return to sick call for an orthopedic referral, Asberry stated that he "thought [Plaintiff] was talking about orthopedic boots." (*Id.*) Plaintiff denied ever mentioning orthopedic boots and asserted that Asberry was intentionally lying to Smith 1. (*Id.*) Plaintiff also claims that Smith 1 was aware that Asberry had lied and "stood there staring at the sky with his hands in his pockets." (*Id.*) Smith 1 then told Plaintiff to return to the sick call "as his and Asberry's way out." (*Id.*)

On March 31, 2016, Plaintiff filed another BP-8 complaining about Ricotta, Asberry, and Smith 1 and requested an investigation. (*Id.*) The BP-8 was directed to Special Investigation Agent Kline, but Plaintiff contends that Kline failed to investigate or process the BP-8 or to forward the complaint to the Federal Bureau of Prison's (BOP) Internal Affairs Division, as requested. (*Id.*) Plaintiff filed a complaint with the Internal Affairs Division, but he "did not receive so much as an acknowledgement letter." (*Id.*)

On March 15, 2016, Plaintiff returned to sick call. (*Id.*) Having received no status updates regarding his request for an orthopedic referral or orthotics, Plaintiff returned to

sick call on April 11, 2016.  (*Id*. at 11.)  Plaintiff told Defendant Briggs that his condition had worsened, he had two numb toes, and he had severe pain in the ball of his foot.  (*Id*.)  Briggs told Plaintiff there was "nothing she could do."  (*Id*.)  Plaintiff asked Briggs to document his worsened condition in his records.  (*Id*.)  Briggs "then became angry and refused [the] request for documentation."  (*Id*.)  The same day, Plaintiff emailed Defendant Ackley, but he did not receive a response.  (*Id*.)

On April 19, 2016, Plaintiff filed another BP-8 and attached four witness statements to corroborate his assertion that the April 11 sick call visit was "five minutes or less."  (*Id*.)  Defendant Dosanj "ignored the issue and witness statements in her response."  (*Id*.)  Dosanj stated that Briggs had submitted a request for Plaintiff to be seen by a specialist on April 11.  (*Id*.)  However, Defendant Tracy stated in a response to a BP-9 that the consult request was submitted on March 15.  (*Id*.)  Plaintiff claims that Tracy and Dosanj's responses were contradictory and that "staff stated anything in an attempt to cover their tracks . . . ."  (*Id*.)  Plaintiff claims that "862764-Fl response explains every issue regarding Health Services and is used as a smoke screen to ignore the refusal of treatment and sick call, failure to document [Plaintiff's] worsening condition, request for investigation, and the formal staff complaint."  (*Id*.)

On June 13, 2016, Plaintiff filed a BP-10, appealing Tracy's denial of "862764-Fl."  (*Id*.)  Defendant Mitchell responded, but failed to address the alleged "refusal to treat at sick call and/or the staff complaint."  (*Id*.)  Plaintiff reported Ricotta's refusal to treat him during his Chronic Care visit, the ignored emails, the "mandated repeat visits to sick call," the threat of "treatment refusal," the refusal to accept the documentation of Plaintiff's diagnosed condition, and the mandated referral to another orthopedist.  (*Id*. at 11-12.)  Mitchell stated that Plaintiff's condition was "self-reported" and directed Plaintiff to report to sick call for further evaluation if he experienced new or worsening symptoms.  (*Id*. at 12.)  Plaintiff appealed Mitchell's denial to BOP's Central Office, but he did not receive a response.  (*Id*.)

On June 15, 2016, Plaintiff was evaluated by an orthotics technician and informed that it would take thirty days to receive an approval for the orthotics, and following approval, Plaintiff would be fitted for the orthotics. (*Id*.) Plaintiff was not seen by a doctor or specialist, and he did not receive any treatment for his numb toes or severe pain. (*Id*.) On June 28, 2016, Plaintiff received Mitchell's response to the BP-10, which allegedly misstated many facts regarding Plaintiff's medical history and again stated that Plaintiff's Morton's neuroma was self-reported, even though Plaintiff had attached his medical records contradicting that assertion. (*Id*.) Plaintiff contends that Mitchell and Tracy "ignored all issues" and concluded that no one had acted with deliberate indifference to Plaintiff's serious medical needs. (*Id*.)

Fifty days after his June 15 appointment, Plaintiff emailed Defendant Ackley and "outlined the situation and requested status." (*Id*.) On August 5, 2016, Plaintiff received a response from Ackley, which stated that the "shoes and inserts were ordered" and that Ackley had sent a request inquiring about the status of those items. (*Id*.) Plaintiff contends that Ackley's response "ignored the bulk of the e-mail." (*Id*.) On August 17, 2016, Ackley emailed Plaintiff asking what size shoe he wore because the order for the custom orthotics was missing that information. (*Id*.) Plaintiff contends, therefore, that as of August 5, 2016, the shoes and inserts had not been ordered. (*Id*.) "They were not signed off and approved by [Defendant] Ricotta until 9/8/2016." (*Id*.) Plaintiff claims that Ackley's assertion that he did not have Plaintiff's shoe size was "a bald-face[d] lie[,]" as his shoe size was "clearly identified on the Consultation Care Form," which was delivered to Ackley and Ricotta on June 15, 2016. (*Id*.) Mitchell also had access to the form. (*Id*.)

On August 15, 2016, Plaintiff again reported to sick call because his condition had worsened, and he had sciatica in his left side because of trying to keep weight off of his right foot. (*Id*. at 12-13.) Plaintiff requested treatment "for everything," but he did not receive any treatment. (*Id*. at 13.) On August 16 and 26, Plaintiff submitted a Request to

Staff form requesting treatment for his numb toes, severe pain, and sciatica. Plaintiff did not receive a response or treatment. (*Id*.)

Subsequently, Plaintiff filed a BP-11 appealing Mitchell's denial of the BP-10. (*Id*.) Defendant Connors "ignored the issues" and stated that the final fitting of the orthotics would be scheduled, that there was no evidence to suggest that anyone had acted with deliberate indifference to Plaintiff's serious medical needs, that Plaintiff had received adequate medical care, and that Plaintiff should comply with the treatment plan. (*Id*.) Plaintiff claims that Connors was aware that the request for orthotics was signed and approved only five days prior to his response. (*Id*.)

As his injury, Plaintiff alleges he suffered two numb toes, severe pain, and psychological trauma. (*Id*. at 9.)

In **Count Two**, Plaintiff alleges that he was diagnosed with reflux esophagitis in 2002, which is documented. (*Id*. at 16.) Previously, Plaintiff was prescribed ranitidine aciphex and omeprazole. (*Id*.) On November 19, 2015, Plaintiff had a Chronic Care appointment with Defendant Ricotta. Plaintiff told Ricotta that his reflux esophagitis had been diagnosed thirteen years prior and that he was properly enrolled in Gastrointestinal Chronic Care ("GI CC"). (*Id*.) Ricotta stated that he would only write a 30-day prescription for omeprazole, and when that prescription expired, Ricotta refused to renew the prescription. (*Id*.) On January 13, 2016, Plaintiff reported to sick call because his condition had worsened, and he was experiencing severe pain. (*Id*.) Plaintiff requested a new prescription, further treatment, and referral to a gastrointestinal specialist. (*Id*.) Plaintiff contends that "[n]o action was taken on any of those requests." (*Id*.)

On January 19, 2016, Plaintiff filed a BP-8 based on a denial of medication. (*Id*.) On January 21, 2016, Defendant Asberry responded that Defendant Ricotta had discontinued Plaintiff's GI CC because "acid reflux as the lone diagnosis does not meet the criteria for a GI CC." (*Id*.) Plaintiff claims that Asberry failed to thoroughly review Plaintiff's medical records and "used the fall-back-crutch," by telling Plaintiff to return to sick call if he needed further evaluation or if his conditions worsened. (*Id*.) Plaintiff

claims that Asberry's response "conceded [Plaintiff] was enrolled in the proper CC for GI and arbitrarily removed." (*Id.* at 17.)

Plaintiff then filed a BP-9, and Defendant Tracy responded on February 21, 2016. (*Id.*) The response "regurgitated Asberry's BP-8 response" and stated that Plaintiff "had not been diagnosed with any of the conditions listed by Asberry." (*Id.*) Tracy further stated that Ricotta told Plaintiff that indigent prisoners could request over-the-counter medications from the pharmacy. (*Id.*) Tracy then outlined the procedure for requesting over-the-counter medications and directed Plaintiff to report to sick call if his conditions worsened. (*Id.*) Plaintiff claims that Ricotta did not tell Plaintiff that he could request over-the-counter medications from the pharmacy because "that subject matter was not at issue . . . ." (*Id.*) Plaintiff further claims that Defendants Tracy, Ricotta, and Asberry would have known that he had not been diagnosed with acid reflux if they had reviewed his medical records. (*Id.*) Plaintiff also contends that medical staff failed to document his complaints about his condition worsening after his sick call visit on January 13, 2016. (*Id.*)

On February 21, 2016, Plaintiff filed a BP-10, appealing Tracy's denial of the BP-9. Plaintiff claimed that Tracy ignored "the issues" and made false statements. (*Id.*) Plaintiff also noted the January 13 sick call in which he reported his worsening condition. (*Id.*) On May 2, 2016, Defendant Mitchell responded and focused on Plaintiff's trust fund account balance, indigency status, and over-the-counter-medications and failed to address "the medical issue." (*Id.*) Mitchell also stated that "there was an 'examination' for GI CC" scheduled on November 19, 2015, but the appointment had been cancelled "due to criteria not being met." (*Id.*) Plaintiff claims that Mitchell then contradicted this statement in a subsequent response by stating that Plaintiff was enrolled in GI CC.[4] (*Id.*) Mitchell also stated that Plaintiff had gone to sick call twice, but did not report worsening GI issues. (*Id.*) Plaintiff appears to assert that he had complained of worsening GI

---

[4] According to Plaintiff, Defendant Ricotta had not examined him on November 19, 2015 to assess his eligibility for GI CC, but had simply told Plaintiff that his GI medication would be terminated after thirty days. (*Id.*)

issues, but medical staff failed to document those complaints. (*Id.*) Plaintiff contends that Defendants Mitchell, Tracy, Ricotta, and Asberry would have known that Plaintiff met the criteria for enrollment in GI CC if they had thoroughly reviewed his records, as they claimed. (*Id.*)

On May 25, 2016, Plaintiff filed a BP-11, appealing Mitchell's denial of the BP-10. (*Id.*) In the appeal, Plaintiff complained of Mitchell "ignoring the issues"; Mitchell "targeting [his] account balance," over-the-counter medications, and indigency; the examination on November 19, 2015; and medical staff's failure to document Plaintiff's conditions during sick calls. (*Id.*) Plaintiff also attached a May 25, 2012 medical record showing that he had been diagnosed with reflux esophagitis. (*Id.*) On July 18, 2016, Defendant Connors responded to the BP-11 and stated that "there was no evidence to suggest [Plaintiff] was not receiving appropriate treatment for the condition" and that "there was 'insufficient diagnostic data' to make a clinical determination of the need for re-enrollment into GI CC." (*Id.* at 17-18.) Plaintiff claims that Connors made these statements despite admitting that "there [was] a condition," that Plaintiff was not receiving any treatment for the condition, and that the medical records clearly showed "sufficient diagnostic data." (*Id.* at 18.) Connors "gave the 'form letter' conclusion," stating that the record reflected that Plaintiff had received medical care and encouraged Plaintiff to comply with the proposed medical treatment plan. (*Id.*) However, Plaintiff contends that "[a]ll treatment had been denied," so there was no treatment plan with which to comply. (*Id.*)

As his injury, Plaintiff alleges that he suffered "constant and consistent severe pain in the GI and esophagus[,]" psychological trauma, and possible permanent damage and was later forced to undergo an unnecessary medical procedure. (*Id.* at 16.)

In **Count Three**, Plaintiff asserts a violation of his due process rights and 10 U.S.C. § 812, i.e., Article 12.[5] Plaintiff, a "military prisoner in the 'legal' custody of the

_____

[5] Article 12 states that "[n]o members of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces." Article 12 "applies to members of the armed forces when

U.S. Army,"[6] was transferred to Defendant BOP's physical custody in January 2006 pursuant to a May 27, 1994 Memorandum of Agreement between the United States Army and BOP.[7]  (*Id.* at 20.)  Since January 2006, Plaintiff claims that he has been housed with "foreign nationals" in violation of Article 12, 10 U.S.C. § 812, at USP-Lewisburg, USP-Victorville, USP-Lompoc, FMC-Devens, FCI-McKean, FCI-Big Spring, FCI-Mendota, FCI-Phoenix, and FCI-Marion.  (*Id.*)

On November 23, 2016, Plaintiff filed a BP-8, apparently claiming that he was being housed with foreign nationals.  (*Id.*)  Plaintiff received a response from a unit manager stating that Plaintiff was appropriately housed under Program Statement (PS) 5110.16, entitled Administration of Sentence for Military Inmates.[8]  (*Id.* at 21.)  On December 30, 2016, Plaintiff filed a BP-9, and received a response from Defendant True on January 18, 2016.  (*Id.*)  In the response, True discussed Plaintiff's convictions and sentences and cited statutes, but "ignored[] and refused to respond to the issue."  (*Id.*)

---

placed in confinement in a state or federal facility within the continental United States due to an adjudged court-martial sentence."  *United States v. Wilson*, 73 M.J. 529, 531 (A.F. Ct. Crim. App.), *aff'd* 73 M.J. 404 (C.A.A.F. 2014).

[6]  Plaintiff was convicted by court martial of violating the Uniform Code of Military Justice and received a lengthy sentence.  *See Andreozzi v. Dep't of Defense*, No. 02-1847 (D.D.C. Sept. 30, 2003), Doc. 54 at 1.

[7]  In *Coder v. O'Brien*, 719 F.Supp.2d 655, 657 n.1 (W.D. Va. 2010), the court explained that,

> The Uniform Code of Military Justice provides that "a sentence of confinement adjudged by a court martial or other military tribunal ... may be carried into execution by confinement in any place of confinement under the control of any of the armed forces or in any penal or correctional institution under the control of the United States...."  10 U.S.C. § 858(a).  Pursuant to this authority, the Department of the Army and the BOP entered into a memorandum of agreement "establish[ing] the policies and procedures governing the transfer of military prisoners in the custody of [the] Department of the Army to the Federal Bureau of Prisons."  (Respondent's Ex. 3 at pg. 1).  Under this agreement, the BOP promised to house up to 500 military prisoners for the Army's convenience.

[8]  PS 5110.16 addresses computation of a sentence, good time, clemency, and release and supervision.  *See* https://www.bop.gov/policy/progstat/5110_016.pdf (last visited Sept. 19, 2018).

Subsequently, Plaintiff filed a BP-10 appealing True's denial and stating that "accepting [Plaintiff] as a military prisoner does not give the authority to violate a congressional mandate and break the law." (*Id.*) Defendant Revell responded on February 17, 2017, stating the length of Plaintiff's sentence and "the congressional mandate of 10 U.S.C.[§] 812 [wa]s an issue between [Plaintiff] and the U.S. Army." (*Id.*) Plaintiff contends that the Memorandum of Understanding only gave BOP physical custody of Plaintiff and that Article 12, 10 U.S.C. § 812, applies to military prisoners held in military or federal prisons. (*Id.*) On March 6, 2017, Plaintiff filed a BP-11, "re-establishing all the issues ignored by the Def." Plaintiff maintains that because the timeframe for a response passed without a response, the lack of response constituted a denial. (*Id.*) Plaintiff names several Defendants as responsible for approving Plaintiff's transfer to BOP custody, his housing assignments, and his "redesignation to a subsequent BOP facility," and for failing to respond to Plaintiff's BP-11 appeal. (*Id.*) Plaintiff further claims that all Defendants named in Count Three are aware that BOP staff must recognize military prisoners and that the Memorandum of Agreement between the U.S. Army and BOP does not allow BOP to violate Article 12 by housing Plaintiff with foreign nationals. (*Id.*)

As his injury, Plaintiff alleges that he has suffered "physical injury" and "psychological trauma." (*Id.* at 20.)

In **Count Four**, Plaintiff asserts a due process claim and a violation of BOP regulation. (*Id.* at 23.) Prior to Plaintiff's November 2015 transfer to FCI-Phoenix, Plaintiff's Public Safety Factor (PSF) for Serious Escape (SE)[9] was assessed, resulting in

---

[9]   PS 5100.08 is entitled "Inmate Security Designation and Custody Classification." *See* https://www.bop.gov/policy/progstat/5100_008.pdf (last visited Sept. 25, 2018). PS 5100.08 provides in part that:

> PUBLIC SAFETY FACTOR. There are certain demonstrated behaviors which require increased security measures to ensure the protection of society. There are nine Public Safety Factors (PSFs) which are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community (i.e., MINIMUM security). The application of a PSF overrides security point scores to ensure the appropriate security level is assigned to an inmate, based in his or her demonstrated current or prior behavior.

placement in higher security facilities based on a record of serious escape. (*Id.*) Plaintiff "requested removal" and asked to be transferred to a low security facility. (*Id.*) The requests were denied. (*Id.*) On January 19, 2016, Plaintiff filed a BP-8, and on April 4, 2016, Defendant Wastell denied the BP-8 "based on incorrect information." (*Id.*) On April 19, 2016, Plaintiff filed a BP-9, and Defendant Tracy responded on April 25, 2016. Tracy stated that Plaintiff was appropriately classified, but failed to explain "'how' [Plaintiff] was appropriately classified with a PSF for SE . . . ." (*Id.*) On May 3, 2016, Plaintiff filed a BP-10, and Defendant Mitchell responded on May 20, 2016. (*Id.*) Mitchell discussed the severity of Plaintiff's offenses, how their severity was assessed, and the discretion of the Unit Team and administration concerning his classification. (*Id.*) Plaintiff claims that "Mitchell used incorrect information" and "failed to cite authority within [PS] 5100.08" or "BOP policy that grants 'discretion' to violate BOP regulations." (*Id.*) On June 27, 2016, Plaintiff filed a BP-11, and Defendant Connors responded on January 18, 2017. (*Id.*) Connors stated that "the PSF was proper," but Plaintiff claims that Connors failed to identify "the method 5100.08 was applied to qualify the assessment." (*Id.*) Plaintiff claims that Defendants Wastell, Tracy, Mitchell, and Connors "refused to apply [PS] 5100.08 and the element(s) required to assess a PSF for SE." (*Id.*)

According to Plaintiff, to assess a prisoner with a PSF for SE, the inmate must have "escaped from a secure facility (prior or instant offense) with or without the threat of violence, or an open institution or program (i.e. minimum security facility, work release, furlough) with the threat of violence" and, consequently, "will be housed in at least a Medium Security Facility." (*Id.* at 24.) Plaintiff claims that he escaped from a hospital, which is neither a secure facility, nor an open institution or program, and that his

---

The PSF for Serious Escape provides in relevant part that:

A male inmate who has escaped from a secure facility (prior or instant offense) with or without the threat of violence or who escapes from an open institution or program with a threat of violence will be housed in at least a Medium security level institution, unless the PSF has been waived.

escape was not a prior or instant offense.  (*Id.*)  Therefore, Plaintiff contends that he is not subject to PS 5100.08 and that under the APA, "the agency action is not committed to agency discretion by law."  (*Id.*)

As his injury, Plaintiff states that he was placed in "an unnecessary and incorrect greater security hardship causing actual injury" because Defendants Wastell, Tracy, Mitchell, and Connors' failure to properly apply PS 5100.08 to classify him.  (*Id.* at 23.)

In **Count Five**, Plaintiff asserts a due process claim concerning disciplinary proceedings and alleges that on February 9, 2012, he received an Incident Report (IR) for allegedly threatening another with bodily harm ("Code 203").  (*Id.* at 25.)  Plaintiff claims that he did not threaten anyone or make the statements "fabricated in the IR." (*Id.*)  The Code 203 was dismissed, but Defendant Amico found Plaintiff guilty of insolence.  (*Id.*)  Despite it being dismissed, the United States Parole Commission considered the Code 203 in rescinding Plaintiff's parole date.  (*Id.*)

On February 9, 2012, Plaintiff was placed in the Special Housing Unit (SHU), and Lieutenant Allred told Plaintiff he was "'suspending' the IR" because the author, Caverly, failed to sign the document.  (*Id.*)  Allred sent a memorandum to Defendant Amico and Caverly, stating that the IR had been suspended because Caverly failed to sign it.  (*Id.*)  Allred also told Caverly he needed a memorandum from Caverly to "justify[] the suspension."  (*Id.*)  Allred stated that the IR would be signed on February 10, 2012, but it was not.  (*Id.*)  On February 15, 2012, Lieutenant Hancock told Plaintiff he had the IR.  (*Id.*)  Plaintiff asked why it took six days to execute the IR, but Hancock did not have an answer.  (*Id.*)  Plaintiff received a copy of the IR with "2/9/2012 as the 'dated delivered," which was "six days after-the-fact."  (*Id.*)  Caverly admitted that he failed to sign the IR, but signed it on his next work day, which was February 15, 2012. (*Id.*)

On February 22, 2012, Plaintiff had a disciplinary hearing, and he "raised the fact that the IR had been suspended for an invalid reason."  (*Id.* at 26.)  Plaintiff told Defendant Amico that an IR could only be suspended if the subject was being

investigated in a criminal prosecution. (*Id.*) Plaintiff asked Amico to dismiss the disciplinary charge, but Amico declined to do so and said that the "procedural issue [was] inconsequential." (*Id.*) According to Plaintiff, under 28 CFR § 541.8(a), the disciplinary hearing officer must decide whether Plaintiff committed the charged acts, Plaintiff committed similar acts as those charged in the IR, or Plaintiff did not commit the charged acts or refer the IR back for further investigation. (*Id.*) However, Amico found Plaintiff guilty of acts that were not charged in the IR and that were not similar to the acts charged in the IR. (*Id.*) On March 8, 2012, Plaintiff received the disciplinary hearing report. (*Id.*) Plaintiff claims that Amico falsified the disciplinary hearing report, stating that Plaintiff did not raise any procedural issues, and Amico failed to document that the IR had been suspended, and that Plaintiff had objected to being found guilty of an act neither charged nor similar to a charged act. (*Id.*)

On March 23, 2012, Plaintiff filed a BP-10, appealing Defendant Amico's guilty finding, which allowed five days for the BP-10 to arrive to the Regional Office in Philadelphia, Pennsylvania. (*Id.*) On April 24, 2012, Plaintiff received a response to the BP-10, stating that "[i]t was rejected" because it was untimely and did not have the disciplinary hearing report attached to it. (*Id.*) "Region" stating that Plaintiff's BP-10 arrived one day past the 20-day deadline. (*Id.*) Plaintiff claims that the five days he accorded for mailing the BP-10 was "ample" and that he did attach a copy of the disciplinary hearing report to the BP-10. (*Id.*) Plaintiff claims that Defendant Jane/John Doe 53 failed to "receive, log-in, and process" his BP-10 in a timely manner and erroneously rejected the appeal. (*Id.* at 27.)

On April 25, 2012, Plaintiff submitted a BP-11, appealing the "Region's" denial of his BP-10. Plaintiff did not receive an acknowledgement of receipt or a response to his BP-11, in violation of 28 CFR § 541.18. (*Id.* at 26.) Plaintiff claims that Defendant Jane/John Doe 54 failed to "receive, log-in, process, and respond to" his BP-11. (*Id.* at 27.)

As his injury, Plaintiff alleges that the guilty finding at the disciplinary hearing was used to expel Plaintiff from a BOP rehabilitative program and the Parole Commission used the dismissed charge and expulsion when it rescinded Plaintiff's parole date. (*Id.* at 26.) Plaintiff states that he is "applying for declaratory relief." (*Id.* at 27.)

In **Count Six**, Plaintiff asserts a due process claim concerning disciplinary proceedings. (*Id.* at 28.) Plaintiff alleges that on December 16, 2012, he received an IR for a "Code 201." (*Id.*) On January 25, 2013, Defendant Schnieder held a disciplinary hearing and found Plaintiff guilty of the Code 201. (*Id.*) On February 4, 2013, Plaintiff filed a BP-10, appealing the guilty finding. (*Id.*) Defendant Norwood responded to the BP-10 and "remanded the case for further review and rehearing, if necessary." (*Id.*) On March 13, 2013, Norwood wrote a memorandum to Defendant Meeks stating that the IR needs to be rewritten to "giv[e] the Inmate notice of the allegations against him." (*Id.*) Plaintiff claims rewriting an IR is not authorized by regulation and that the original IR described the incident and provided him with notice of the allegations. (*Id.*) On March 20, 2013, the IR was "rewritten and altered by Def[endant] Murphy." (*Id.*) Plaintiff claims that Murphy's rewrite was "factually incorrect," "unnecessary," "and in violation of the Code of Federal Regulations and BOP regulations." (*Id.* at 28-29.)

On May 2, 2013, the second disciplinary hearing was held, and Plaintiff told Defendant Schnieder that 28 CFR § 541.1 did not allow for rewriting or altering an IR. (*Id.* at 29.) Plaintiff asked that the charges be dismissed and the IR expunged. (*Id.*) Schnieder denied Plaintiff's request and found Plaintiff guilty despite testimony from the witnessing officer that the officer had not witnessed the alleged altercation or Plaintiff acting aggressive or offensive. (*Id.*)

On June 3, 2013, Plaintiff submitted a BP-10, appealing the guilty finding. (*Id.*) On July 10, 2013, Defendant Norwood responded and stated that nothing prohibits staff from rewriting IRs, but he failed to cite any authority that explicitly authorizes rewriting IRs. (*Id.*) On August 1, 2013, Plaintiff submitted a BP-11 regarding the rewritten IR. (*Id.*) Defendant Rodgers responded and "did nothing more than regurgitate" a portion of

Plaintiff's appeal and failed to cite any authority that authorizes rewriting or altering IRs. (*Id.*)

As his injury, Plaintiff alleges that the conviction from the disciplinary hearing elevated his custody status and the Parole Commission used the finding when it rescinded Plaintiff's parole date. (*Id.* at 28.)

Plaintiff seeks monetary damages and declaratory and injunctive relief. (*Id.* at 30.)

## III. Failure to State a Claim

### A. Defendant Dosanj

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a *Bivens* medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of*

*Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Plaintiff alleges that Defendant Dosanj's response regarding when the request for a consult was submitted was contradictory to Defendant Tracy's response and that "staff stated anything in an attempt to cover their tracks . . . ." This allegation is not sufficient to show that Dosanj acted with deliberate indifference to Plaintiff's serious medical need. Plaintiff does not allege that Dosanj intentionally lied and interfered with the consultation request. Accordingly, the Court will dismiss Defendant Dosanj without prejudice.

## B.    Count Three – Violation of 10 U.S.C. § 812

Plaintiff asserts a violation of his due process rights and 10 U.S.C. § 812, Article 12, which prohibits confinement with enemy prisoners. Specifically, Article 12 states that "[n]o members of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces." Article 12 "applies to members of the armed forces when placed in confinement in a state or federal facility within the continental United States due to an adjudged court-martial sentence." *United States v. Wilson*, 73 M.J. 529, 531 (A.F. Ct. Crim. App.), *aff'd* 73 M.J. 404 (C.A.A.F. 2014). "The heart of this prohibition lies in the words 'in immediate association' and is not necessarily violated by the general confinement of the designated classes of prisoners within the same institution." *Kuykendall v. Taylor*, 285 F.2d 480, 481 (10th Cir. 1960). Military courts have defined "immediate association" as "being confined in a manner so that [military personnel] would be directly connected or

combined with *captured* foreign personnel." *United States v. Wise*, 64 M.J. 468, 474 (C.A.A.F. 2007) (emphasis added). The *Wise* court concluded that a member of the armed forces was not in "immediate association" with a foreign national for purposes of § 812 when a "single strand of concertina wire" separated the member and Iraqi prisoners. *Id.*

Plaintiff's allegations in Count Three are too vague and conclusory to state a claim. Plaintiff names numerous Defendants from several different federal prisons and states that since January 2006 he has been housed with foreign nationals. But Plaintiff fails to provide any facts to support that he was ever placed in "immediate association" with foreign nationals. Plaintiff has not alleged facts to support that he was ever confined in the same cell as a foreign national or that he was ever forced to come into direct contact with a foreign national. Accordingly, the Court will dismiss Count Three.

**C.     Count Four – Due Process and BOP Policy Violations**

In Count Four, Plaintiff alleges that his requests to be transferred to a low security facility were denied and claims that he is not subject to PS 5100.08, which provides that an inmate who escaped from a secured facility, or an open institution with the threat of violence, be housed in at least a medium security facility. Plaintiff claims that he did not escape from a security facility because he escaped from a hospital.

Plaintiff contends that the Court has jurisdiction to hear the allegations contained in Count Four pursuant to the APA. The APA instructs that a person that is detrimentally affected by an agency decision is entitled to judicial review of that decision unless the statute precludes review or the action complained of has been committed to agency discretion. *See* 5 U.S.C. §§ 701, 702. "Judicial review of agency actions made pursuant to 18 U.S.C. § 3621, including actions made under P.S. 5100.08, is foreclosed under 18 U.S.C. § 3625." *Aldaco v. Holder*, No. 10-590(JRT/LIB), 2011 WL 825624, at *11 (D. Minn. Jan. 7, 2011.) Under § 3621, "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment." Accordingly, Plaintiff's claim that Defendants acted in violation of PS 5100.08 or § 3621 fails for lack of subject matter jurisdiction.

**TERMPSREF**

### D.    Counts Five and Six-Disciplinary Challenges

In Counts Five and Six, Plaintiff alleges that he was denied due process in connection with disciplinary proceedings. In Count Five, Plaintiff alleges that Defendant Amico found him guilty of acts that were not charged in the Code 203 IR or acts similar to those charged in the Code 203, which violates 28 C.F.R. § 541.8(a). Plaintiff further contends that Defendants Jane/John Doe 53 and 54 failed to timely process and/or respond to his appeals. In Count Six, Plaintiff alleges that Defendant Murphy 2 rewrote and/or altered an IR and that the rewritten IR was "factually incorrect," "unnecessary," "and in violation of the Code of Federal Regulations and BOP regulations." Plaintiff also alleges that Defendant Schnieder found him guilty of the charge despite testimony from the witnessing officer that did not support the guilty finding. Lastly, Plaintiff asserts that in Defendants Norwood and Rodgers' responses to his appeals, they failed to cite any authority that explicitly authorized rewriting an IR.

#### a.    APA Claims

In Counts Five and Six, Plaintiff asserts that he is bringing his claims pursuant to the APA and asserts that "[t]he agency action is reviewable as a final agency action for which there is no other adequate remedy." The APA, however, "is not applicable to federal prison disciplinary proceedings." *Clardy v. Levi*, 545 F. 2d 1241, 1246 (9th Cir. 1976). The Court will dismiss Plaintiff's APA claims.

#### b.    *Bivens* Claims

In a *Bivens* action, the applicable statute of limitations is the forum state's statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 266, 274-76 (1985); *Vaughan v. Grijalva*, 927 F.2d 476, 478 (9th Cir. 1991). The Arizona statute of limitations for personal injury actions is two years. *See* Ariz. Rev. Stat. § 12-542(1); *Madden-Tyler v. Maricopa County*, 943 P.2d 822, 824 (Ariz. Ct. App. 1997); *Vaughan*, 927 F.2d at 478. "[A] claim generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action." *Cabrera v. City of Huntington Park*, 159 F.3d 374, 379 (9th Cir. 1998).

Plaintiff states his injuries occurred in 2012 and 2013. Plaintiff clearly had contemporaneous knowledge of the claimed violations, and did not commence this action until significantly more than two years after they accrued. Accordingly, these *Bivens* claims are time-barred and will be dismissed.

**IV.    Claims for Which an Answer Will Be Required**

Liberally construed, Plaintiff has sufficiently asserted an Eighth Amendment medical care claim against Defendants Ricotta, Asberry, Smith 1, Briggs, Ackley, Tracy, Mitchell, and Connors in Count One, and the Court will require these Defendants to answer Count One.  *See Carlson v. Green*, 446 U.S. 14 (1980) (recognizing a *Bivens* remedy for a violation of the Eighth Amendment prohibition against cruel and unusual punishment by a prisoner who claimed federal prison officials had failed to treat his asthma).

Liberally construed, Plaintiff has sufficiently asserted an Eighth Amendment medical care claim against Defendants Ricotta, Asberry, Tracy, Mitchell, and Connors in Count Two, and the Court will require these Defendants to answer Count Two.

**V.    Warnings**

**A.    Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

**B.    Copies**

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files.  Fed. R. Civ. P. 5(a).  Each filing must include a certificate stating that a copy of the filing was served.  Fed. R. Civ. P. 5(d).  Also, Plaintiff must submit an additional copy of every filing for use by the Court.  *See* LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

### C. Possible Dismissal

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)     Counts Three, Four, Five, and Six are **dismissed** without prejudice.

(2)     Defendants John/Jane Doe 1-54, Giordani, Childress, Williamson, Norwood, Hutton, Grondolsky, Smith 2, Wilson, Meeks, Jones, Batts, Zuniga, Powell, Jefferson, Dosanj, Wastell, Jones, Dooley, Clark, Basler, Murphy 1, Byrum, Daun, Powers, True, Revell, the United States of America, the Federal Bureau of Prisons, Amico, Schnieder, Norwood, Murphy 2, and Rodgers are **dismissed** without prejudice.

(3)     Defendants Ricotta, Asberry, Smith 1, Briggs, Ackley, Tracy, Mitchell, and Connors must answer Count One, and Defendants Ricotta, Asberry, Tracy, Mitchell, and Connors must answer Count Two.

(4)     Plaintiff's Motion for Service ((Doc. 3) is **denied** as moot.

(5)     The Clerk of Court must send Plaintiff a service packet including the Complaint (Doc. 1), this Order, and summons forms for Defendants Ricotta, Asberry, Smith 1, Briggs, Ackley, Tracy, Mitchell, and Connors.

(6)     Plaintiff must complete and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(7)     If Plaintiff does not complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(8)     The United States Marshal must retain the Summons, a copy of the Complaint, and a copy of this Order for future use.

(9)　　The United States Marshal must for the individual Defendants Ricotta, Asberry, Smith 1, Briggs, Ackley, Tracy, Mitchell, and Connors, personally serve a copy of the Summons, Complaint, and this Order at Government expense, pursuant to Rule 4(e)(2) and (i)(3) of the Federal Rules of Civil Procedure.

(10)　　The Clerk of Court must send by certified mail a copy of the Summons for each individual Defendant, the Complaint, and this Order to (1) the civil process clerk at the office of the United States Attorney for the District of Arizona and (2) the Attorney General of the United States, pursuant to Rule 4(i)(1) of the Federal Rules of Civil Procedure.

(11)　　Defendants must answer the Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(12)　　Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(13)　　This matter is referred to Magistrate Judge Bridget S. Bade pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

Dated this 12th day of October, 2018.

_David G. Campbell_

David G. Campbell
Senior United States District Judge